IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CLEVELAND BIAS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No.  3:16-CV-3050-N-BH |
| | § | |
| NANCY A. BERRYHILL, ACTING, | § | |
| COMMISSIONER OF THE SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | Referred to U.S. Magistrate Judge |

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION

By *Special Order No. 3-251*, this social security appeal was automatically referred for full case management. Before the Court are *Plaintiff's Opening Brief*, filed March 17, 2017 (doc. 14), *Defendant's Brief*, filed April 14, 2017 (doc. 15), and *Plaintiff's Reply Brief*, filed May 4, 2017 (doc. 16). Based on the relevant filings, evidence, and applicable law, the Commissioner's decision should be **REVERSED**, and the case should be **REMANDED** for further administrative proceedings.

## I.  BACKGROUND[1]

Cleveland Bias (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner)[2] denying his claim for disability insurance benefits (DIB) under Title II of the Social Security Act (Act). (doc. 14.)

### A.    Procedural History

On February 13, 2012, Plaintiff filed his application for DIB, alleging disability beginning

---

[1]   The background information is summarized from the record of the administrative proceeding, which is designated as "R."

[2]   At the time of filing of this appeal, Carolyn W. Colvin was the Acting Commissioner of the Social Security Administration, but she was succeeded by Nancy A. Berryhill beginning January 20, 2017.

on September 2, 2011. (R. at 218-23.) His claim was denied initially and upon reconsideration. (R. at 98-99.) Plaintiff requested a hearing before an Administrative Law Judge (ALJ), and personally appeared and testified at a hearing on April 3, 2013. (R. at 40-73.) On May 23, 2013, the ALJ issued a decision finding Plaintiff not disabled and denying his claim for benefits. (R. at 100-14.) Plaintiff timely appealed the ALJ's decision to the Appeals Council. (R. at 115.) The Appeals Council granted his request for review on July 2, 2014, vacated the ALJ's decision, and remanded the case for further consideration. (R. at 116-17.)

On remand, the ALJ conducted another hearing on April 14, 2015, and Plaintiff personally appeared and testified. (R. at 74-97.) On June 5, 2015, the ALJ issued a decision again finding Plaintiff not disabled and denying his claim for benefits. (R. at 10-39.) Plaintiff timely appealed the ALJ's decision to the Appeals Council. (R. at 1.) The Appeals Council denied his request for review on September 6, 2016, making the ALJ's decision the final decision of the Commissioner. (R. at 1-3.) Plaintiff timely appealed the Commissioner's decision under 42 U.S.C. § 405(g). (*See* doc. 1.)

## B.    Factual History

### 1.    Age, Education, and Work Experience

Plaintiff was born on October 11, 1958, and was 56 years old at the time of the second hearing before the ALJ. (R. at 77, 98.) He graduated from high school and communicated in English fluently. (R. at 77-78.) He had past relevant work as an oiler, utility worker, security guard, and welder. (R. at 344.)

### 2.    Medical Evidence

On September 7, 2011, Plaintiff presented to Red Oak Family Clinic for pain in his neck, legs, and lower back. (R. at 400-02.) He met with his primary care physician, Dr. Ferne Cummings,

M.D., who ordered an MRI of Plaintiff's lumbar and cervical spine. (R. at 412-15.) The MRI showed developed osteophytes in his anterior longitudinal ligaments and degenerative disc disease in vertebrae L4-5, but there were no fractures or other joint problems. (R. at 412, 414.) Dr. Cummings prescribed Plaintiff pain medication and referred him to Dr. Stephen Ozanne, M.D., for an orthopedic evaluation and further diagnosis. (R. at 420-25, 442.)

On October 13, 2011, Plaintiff met with Dr. Ozanne. (R. at 345-46.) Plaintiff reported "sharp" and "stiff" pain in his lower back and extremities, as well as reoccurring headaches that happened "constantly and daily," but he could not identify any injury that might have caused the symptoms. (R. at 345-46.) After a physical examination and review of the MRI results, Dr. Ozanne diagnosed him with spinal stenosis, spondylolisthesis, and unspecified disc degeneration. (R. at 345.) He referred Plaintiff for four weeks of physical therapy, after which he would return for a follow-up examination. (R. at 346.)

Between October 19, 2011, and December 15, 2011, Plaintiff completed physical therapy at Green Oaks Physical Therapy Orthopedic Spine & Sports (Green Oaks). (R. at 382-84.) At his initial evaluation, the range of motion in his cervical spine was identified as "full and functional with noted discomfort at end range cervical flexion," and the range of motion in his lumbar spine had limitations in extension and flexion with "noted pain provocation." (R. at 382.) He showed "significant flexibility restrictions," but his lumbar spine stabilization strength was "graded at 4/5." (R. at 382-83.) During the physical therapy, Plaintiff increased his "endurance and tolerance to activity," but he still showed numbness and pain in his legs after walking "more than 5 minutes." (R. at 379-80.)

On November 10, 2011, Plaintiff returned to Dr. Ozanne for a follow-up examination. (R.

at 347-48.) Dr. Ozanne noted a "tender and tight left lower lumbar," but also noted that Plaintiff could "heel and toe raise evenly." (R. at 347.) He again diagnosed Plaintiff with spinal stenosis, spondylolisthesis, and unspecified disc degeneration. (R. at 347-48.)  He referred Plaintiff for a lumbar MRI and administered lumbar epidural steroid injections. (R. at 348.)

From November 3, 2011, to January 25, 2013, Plaintiff met with Dr. Cummings approximately every two months for follow-up examinations and refills on his pain medication. (R. at 519-24, 545-62.) Plaintiff reported minor improvements from the steroid injections administered by Dr. Ozanne, but he still had moderate to severe lower back pain and had difficulty walking for longer than 15 minutes at a time. (R. at 519, 521, 523, 545, 551, 561.) Beginning in early 2012, Dr. Cummings noted that he had showed symptoms of gout with increased pain in his knees. (R. at 545, 549, 557.) After Plaintiff failed to respond to the medication and treatment, Dr. Cummings referred him to a pain management specialist at the Texas Anesthesia and Pain Management Institute on May 23, 2012. (R. at 501, 537-42.)

On November 14, 2011, Plaintiff received a second MRI of his lumbar spine at Methodist Midlothian Imaging. (R. at 408-10.) The MRI again showed a bilateral foraminal stenosis at the L4-5 vertebrae and degenerative disc disease. (R. at 409.)

On December 20 and 27, 2011, Plaintiff returned to Dr. Ozanne for follow-up evaluations. (R. at 349-52.) Dr. Ozanne noted that he had "completed 8 sessions of physical therapy with some improvement in mobility," and that the steroid injections were effective for a period of time but wore off. (R. at 349.) He identified no change in Plaintiff's physical examination or diagnosis, but he noted that Plaintiff "was feeling some improvement and more optimistic about his work while the steroid injection was in place, but since it [had] worn out he [had] some uncertainties." (R. at 350.)

4

At Plaintiff's final exam, Dr. Ozanne noted that Plaintiff "would like to see if he can handle light duty status." (R. at 352.) Dr. Ozanne provided a letter opining that Plaintiff was limited to "periods of sitting, standing, or walking to 30 minutes at a time." (R. at 377.)

On December 21, 2011, Plaintiff received a Physical Performance Evaluation at Green Oaks. (R. at 384-99.) It concluded that Plaintiff could occasionally lift 11-20 pounds and frequently lift 1-10 pounds during a normal day. (R. at 387.) Plaintiff was "able to carry out all instructions as directed" but had "major limiting factors" due to reported pain in his bilateral lower extremities. (R. at 387-88.) He also showed the "ability to perform sitting at 30 minutes, standing at 30 minutes, and walking at 30 minutes." (R. at 387.)

On May 7, 2012, Dr. Kim Rowlands, M.D., a state agency medical consultant (SAMC) reviewed Plaintiff's medical evidence on record and submitted a Physical Residual Functional Capacity (RFC) Assessment Form. (R. at 451-58.) She determined that his primary diagnoses were spinal stenosis and cervical spondylosis. (R. at 451.) She opined that Plaintiff had the following exertional limitations: could occasionally lift 20 pounds; could frequently lift 10 pounds; could stand/walk with breaks for about 6 hours in an 8-hour workday; could sit for about 6 hours in an 8-hour workday; and had an unlimited ability to push/pull. (R. at 452.) She further opined that he had no manipulative or visual limitations, but he had the following postural limitations: could never climb ramps, stairs, ladders, ropes, or scaffolds; could occasionally balance, stoop, kneel, crouch, and crawl. (R. at 453-55.) She concluded that Plaintiff's allegations of pain were "partially supported" by the medical evidence in the record. (R. at 458.)

On July 3, 2012, Dr. Michal Douglas, M.D., a SAMC completed a Case Assessment Form upon reconsideration that was based on Plaintiff's medical records in his file. (R. at 498.) He

5

affirmed Dr. Rowlands's Physical RFC assessment from May 7, 2012, and noted that no new medical records had been submitted by Plaintiff. (R. at 498.)

On May, 23 2012, Plaintiff met with Dr. Adam Arredondo, M.D., at the Texas Anesthesia and Pain Management Institute. (R. at 501, 537-42.) He continued to meet with and receive pain management treatment from Dr. Arredondo over the following three years. (R. at 580-627, 636-59, 670-794, 899-976.) During Plaintiff's initial evaluations, Dr. Arredondo noted that he had "exhausted multiple treatment modalities," but he "did not improve to be satisfactory" because he still experienced severe spasms and pain in his lumbar spine. (R. at 619, 623.) His physical examination results were largely normal except for "reflexes diminished bilaterally" and a decreased "rotation/flexion" in his lumbar spine. (R. at 625, 620.) Dr. Arredondo's assessment was radicular syndrome of the lower limbs, chronic pain syndrome, and osteoarthritis. (R. at 621, 625.) He prescribed pain medication and advised of the possibility of surgically implanted "stimulators" to alleviate the pain in his spine. (R. at 621, 623-35.)

On July 16, 2012, Plaintiff presented to Baylor Surgicare at Ennis for a surgery performed by Dr. Luis Nueves, M.D., to implant "dual lead spinal cord stimulators" in his lower back. (R. at 488-90.) The stimulators were meant to help alleviate his chronic pain syndrome and lumbar spine pain. (R. at 489.) The surgery had "no complications," and the stimulators were successfully tested while Plaintiff recovered. (R. at 490.) Dr. Nueves noted that it had been a "successful placement," and Plaintiff "denied any motor or neurosensory deficits." (R. at 490.)

On December 7, 2012, Plaintiff returned to Dr. Arredondo with complaints of pain in the area where the stimulators had been implanted. (R. at 601-04.) X-rays showed "migration" of the stimulators, and Dr. Arredondo recommended an additional surgery to address the issue. (R. at 602-

03.) Plaintiff consented to the procedure and presented to Baylor Surgicare at Ennis on December 17, 2012, for surgery to address the migration. (R. at 612-15.) His operative report showed diagnoses of chronic pain syndrome and radiculopathy lower extremities. (R. at 612.) The operation was described as "successful" with no complications. (R. at 613.) Dr. Arredondo noted that Plaintiff "tolerated the procedure well." (R. at 614.)

Between December 28, 2012, and June 11, 2014, Plaintiff met with Dr. Arredondo monthly for pain management and treatment. (R. at 580-600, 636-45, 670-700.) Plaintiff consistently presented with complaints of pain in his lumbar back, knees, and legs. (R. at 580, 585, 589, 636, 670, 675.) His physical examinations were generally normal except for bilateral crepitation of the knees, tenderness in his legs, and a decreased range of motion in his lower extremities. (R. at 581, 586, 590, 637-39, 672, 676-77.) Dr. Arredondo assessed him with osteoarthritis of the lower legs, spondyloarthrosis, and radicular syndrome of the lower limbs. (R. at 582, 586, 590, 595, 640, 644, 673, 677.) He received additional steroid injections into his knees, which resulted in some temporary improvement and decrease in pain. (R. at 583, 591.) Dr. Arredondo also instructed him on exercises to increase the range of motion in his lower extremities. (R. at 583-84, 588, 596, 641, 694.)

On February 17, 2013, Dr. Arredondo completed a RFC questionnaire on behalf of Plaintiff. (R. at 577-79, 628-30.) He identified Plaintiff's medical conditions as spinal stenosis, cervical spondylosis, and bilateral osteoarthritis in his knees. (R. at 577, 628.) He opined that Plaintiff had the following limitations: could stand/walk for less than 2 hours in an 8-hour workday; could sit for less than 6 hours in an 8-hour workday; could occasionally carry/lift 20 pounds; and was limited in climbing, kneeling, crawling, crouching, and stooping. (R. at 578, 629.) Dr. Arredondo explained that his opinions were based upon and supported by Plaintiff's MRI results, his bilateral knee

osteoarthritis diagnosis, and their treatment history. (R. at 630.)

Between September 17, 2014, and March 18, 2015, Plaintiff returned to monthly appointments with Dr. Arredondo for pain management. (R. at 899-976.) He continued to complain about increased pain in his knees, the gout flare-ups in his feet, and the pain in his lower back. (R. at 899, 904, 912, 916.) Dr. Arredondo noted a decreased "flex/rotation" in the joints of his lower extremities during musculoskeletal exams (R. at 901, 905, 913, 917-18.) He offered the same assessments of osteoarthritis of the lower legs, spondyloarthrosis, and radicular syndrome of the lower limbs. (R. at 901-02, 906, 914, 918-19.) Dr. Arredondo performed therapeutic and "intra-articular" steroid injections into Plaintiff's lumbar spine on September 29, 2014, and October 13, 2014, but it was noted that these injections had been effective for only a short while. (R. at 947, 952.) During Plaintiff's appointment on March 18, 2015, Dr. Arredondo opined that he could sit, stand, and walk for 2.5 hours a day at most, and he was limited to only occasional reaching, manipulating, grasping, balancing, stooping, kneeling, and crouching. (R. at 973-74.)

### 3.    April 3, 2013 Hearing

Plaintiff and a vocational expert (VE) testified at a hearing before the ALJ on April 3, 2013. (R. at 40-73.) Plaintiff was represented by an attorney. (R. at 42.)

#### a.    *Plaintiff's Testimony*

Plaintiff testified that he was 54 years old and married with four adult children. (R. at 42.) He graduated from high school, took college courses but received no degree, and had not worked since September 2011. (R. at 42-43, 44.) His most recent job had been an "oiler" for the Navy where he worked in the engine room of a ship. (R. at 44.) He had to leave that job because of "severe lower back pain" and pain in his legs and neck. (R. at 43.) He had previously worked for the City of Seattle

as a metal fabricator on heavy machinery, repairing doors and cutting out metal plating. (R. at 46.) Before that, he worked part-time as a security guard while taking college courses. (R. at 45.)

When asked about his medical history, Plaintiff explained that he had been prescribed pain medication, received physical therapy, and had two surgeries to implant "stimulators" in his back to alleviate his pain. (R. at 46.) The stimulators were somewhat effective on the nerve and muscle pain but did not help his "bone pain." (R. at 47.) He also experienced episodes of gout twice a month that lasted "anywhere from 3 to 7 days," during which he could not leave his bed. (R. at 48.) He had been prescribed a cane to help with his leg pain, and he could walk "for about 5 minutes" before needing support or rest. (R. at 49.) He also could sit for "about 10 or 15 minutes" before needing to stand up or move. (R. at 49.) When asked about any vocational training, Plaintiff testified that he had never met with a vocational counselor. (R. at 53-54.)

### b.    VE's Testimony

The VE testified that she had reviewed Plaintiff's work history and had heard Plaintiff's testimony regarding his medical impairments. (R. at 54-55.) The ALJ asked about a vocational counseling session for a hypothetical individual with the same background and impairments as Plaintiff. (R. at 55.) The VE noted that the first step was to refer the hypothetical individual for a vocational and functional capacity evaluation. (R. at 55.)  After being referred to the functional capacity evaluation executed by Dr. Arredondo, which stated that Plaintiff was unable to do work in the "light" job base category, the VE explained that she would attempt to find a job "that would accommodate to his current capacity" and refer him to a "job coach" to ensure that he could perform the essential functions of the job. (R. at 56-57.) This job coach would be assigned through the Department of Assistive and Rehabilitation Services (DARS) with no cost to the individual. (R. at

58.) If an individual could not be retrained for another full-time position, then benefits would be awarded automatically. (R. at 63-64.)

The ALJ then noted that Plaintiff had never received any job counseling or assistance from DARS. (R. at 59-60.) He explained that Plaintiff should meet with DARS to conduct an appropriate work evaluation. (R. at 65.) The ALJ additionally asked Plaintiff to receive another functional capacity examination by Dr. Arredondo to determine what "symptoms and limitations reasonably [were] attributable to a medically determinable impairment." (R. at 71.) The ALJ concluded the hearing by explaining how he would issue a decision after he received that additional information. (R. at 72-73.)

### 4.    April 14, 2015 Hearing

On remand, Plaintiff, a medical expert (ME), and a VE testified at a hearing before the ALJ on April 14, 2015. (R. at 74-97.) Plaintiff was represented by an attorney. (R. at 76.)

#### a.    Plaintiff's Testimony

Plaintiff testified that he had met with DARS, and he had been placed as an associate in a Wal-Mart store.[3] (R. at 78-80.) He had to stop working at Wal-Mart after only two days because of the gout flare-ups in his knees. (R. at 78-79.) He explained that the DARS representative had told him to "try to get [his] medical situation under control and then come back." (R. at 79.)

When asked about his daily activities, Plaintiff testified that he had tried "to live [his] life as normal as possible, but [he had experienced a] series of flare-ups with gout and back pain." (R. at 83.) He tried to "do things around the house to keep [himself] busy, but at least twice a day [he

---

[3] After the first hearing, Plaintiff met with a vocational counselor on May 6, 2013. (R. at 660-68.) He received an Individualized Plan for Employment (IPE), and the counselor noted that Plaintiff was "capable to achieving a successful work outcome with the assistant of [DARS] services." (R. at 661, 663-68.)

had] to go lay down." (R. at 83.) He also had pain and stiffness in his lower back "at least once a month" that he treated with "hot pads and ice." (R. at 85-86.)

When asked if he could return to work as a security guard, Plaintiff testified that he could not do so because he was unable to walk for long periods of time due to his lower back and leg pain. (R. at 87.) He explained that he could walk for only "5 or 10 minutes" before having to sit down. (R. at 87.) He could sit for "maybe 25, 20 minutes" before he had to move again. (R. at 92.) He also had difficulty driving because he had trouble lifting his right leg to "get to the brake." (R. at 89.)

### b.    ME's Testimony

The ALJ asked the ME why there were repeated references to chronic pain in the record. (R. at 92.) The ME responded that he need an evaluation from a pain management specialist "to define that because there's enough hints in [the medical record] that it's there, but nobody grabs it and focuses it." (R. at 92-93.) Plaintiff's attorney had no cross-examination questions. (R. at 93.)

### c.    VE's Testimony

The VE testified that she had reviewed Plaintiff's work history and determined that he had the following past relevant work: oiler, DOT 699.687-018 (medium, semi-skilled, SVP: 3); utility worker, DOT 929.687-030 (heavy, semi-skilled, SVP: 3); and security guard, DOT 372.667-034 (light, semi-skilled, SVP: 3). (R. at 94, 344.)

The ALJ asked the VE to consider a hypothetical person of the same age and education as Plaintiff with the following limitations: able to lift and carry 20 pounds occasionally and 10 pounds frequently; sit, walk, and stand for six hours in an eight-hour workday; not able to climb ramps, stairs, ladders, ropes, or scaffolds; occasionally able to balance, stoop, kneel, crouch, and crawl. (R. at 93.) The VE testified that this hypothetical individual could perform Plaintiff's past relevant work

of security guard. (R. at 93.)

## C.    ALJ's Findings

The ALJ issued a decision denying benefits on June 5, 2015. (R. at 10-39.) At step one,[4] he determined that Plaintiff had not engaged in substantial gainful activity since his alleged onset date of September 2, 2011. (R. at 15.) At step two, the ALJ found that the medical evidence established that Plaintiff had a severe combination of the following impairments: stenosis; degenerative disc disease; osteoarthritis; spondylosis; gout; carpal tunnel syndrome; and obesity. (R. at 15-20.) At step three, the ALJ concluded that Plaintiff's severe impairments or combination of impairments did not meet or equal the requirements for presumptive disability under the listed impairments in 20 C.F.R. Part 404. (R. at 21.)

The ALJ then determined that Plaintiff retained the RFC to perform the full range of work with the following limitations: able to lift and carry 20 pounds occasionally and 10 pounds frequently; able to sit, stand, and walk for 6-hours in an 8-hour workday; never able to climb ramps, stairs, ladders, ropes, or scaffolds; occasionally able to balance, stoop, kneel, crouch, and crawl; and should avoid concentrated vibration due to his carpal tunnel syndrome. (R. at 22.)

At step four, the ALJ relied upon the VE's testimony and determined that Plaintiff could return to his past relevant work experience as a security guard. (R. at 32.) Because he found that Plaintiff could return to his past relevant work, the ALJ did not reach step five. (R. at 33.) Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined by the Social Security Act, from the alleged onset of disability date of September 2, 2011, through the date of his decision. (R. at 33.)

---

[4] The five-step analysis used to determine whether a claimant is disabled under the Social Security Act is described more specifically below.

## II. LEGAL STANDARD

Judicial review of the commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. §§ 405(g), 1383(c)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence supports the Commissioner's decision. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id.* The Court may rely on decisions in both areas, without distinction, when reviewing an ALJ's decision. *Id.*

To be entitled to social security benefits, a claimant must prove he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage

in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 189, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" will not be found to be disabled.

4. If an individual is capable of performing the work he had done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (per curiam) (summarizing 20 C.F.R. § 404.1520(b)-(f)) (currently 20 C.F.R. § 404.1520(a)(4)(i)-(v)). Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id*. Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the

regulations, by vocational expert testimony, or other similar evidence. *Froga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### III. ISSUE FOR REVIEW

Plaintiff presents one issue for review:

1. Substantial evidence does not support the Administrative Law Judge's finding [Plaintiff] could stand and walk for six hours in an eight-hour workday.

(doc. 14 at 2.)

### A.    <u>Treating Source Opinion</u>

Plaintiff argues that the ALJ erred during the RFC determination because he "did not evaluate and analyze the regulatory factors [under 20 C.F.R. § 404.1527(c)] when considering Dr. Arredondo's medical opinion" as a treating source.  (doc. 14 at 14.)

The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity." *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985). A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record. *Leggett*, 67 F.3d at 564. Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings." *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted).  Courts "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the" ALJ's decision. *Id.* They may not reweigh the evidence or substitute their judgment for that of the Commissioner, however, and a "no substantial evidence" finding is appropriate only if there is a "conspicuous

15

absence of credible choices" or "no contrary medical evidence[.]" *See Johnson*, 864 F.2d at 343 (citations omitted).

Although every medical opinion is evaluated regardless of its source, the Commissioner generally gives greater weight to opinions from a treating source. 20 C.F.R. § 404.1527(c)(2). A treating source is a claimant's "physician, psychologist, or other acceptable medical source" who provides or has provided a claimant with medical treatment or evaluation, and who has or has had an ongoing treatment relationship with the claimant. *Id.* at § 404.1502. When "a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence," the Commissioner must give such an opinion controlling weight. *Id.* at § 404.1527(c)(2).  If controlling weight is not given to a treating source's opinion, the Commissioner considers six factors in deciding the weight given to each medical opinion: (1) whether the source examined the claimant or not; (2) whether the source treated the claimant; (3) the medical signs and laboratory findings that support the given opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is made by a specialist or non-specialist; and (6) any other factor which "tend[s] to support or contradict the opinion." *See id.* at § 404.1527(c)(1)–(6).

While an ALJ should afford considerable weight to opinions and diagnoses of treating physicians when determining disability, sole responsibility for this determination rests with the ALJ. *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000). If evidence supports a contrary conclusion, an opinion of any physician may be rejected. *Id.*  Nevertheless, "absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject

16

the opinion of the treating physician only if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in [then] 20 C.F.R. § 404.1527(d)(2)." *Id.* at 453. A detailed analysis is unnecessary, however, when "there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another" or when the ALJ has weighed "the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion." *Id.* at 458.

Here, Dr. Arredondo consistently opined in RFC questionnaires that Plaintiff could stand/walk for less than 2 hours in an 8-hour workday; could sit for less than 6 hours in an 8-hour workday; could occasionally carry/lift 20 pounds; and was limited in climbing, kneeling, crawling, crouching, and stooping. (R. at 578, 629.) He further explained that his opinions were based upon and supported by Plaintiff's MRI results, his bilateral knee osteoarthritis diagnosis, and the treatment history and relationship. (R. at 630.)

In his decision, the ALJ identified Dr. Arredondo as a treating source, but he did not accept all of Dr. Arredondo's opinions, and instead determined that Plaintiff was able to sit, stand, and walk for 6-hours in an 8-hour workday. (R. at 22.) None of the other medical records, including those from Drs. Cummings and Ozanne, found Plaintiff capable of standing/walking for 6 hours during a normal workday, and the only medical opinion that does make this finding is the evaluation from Dr. Rowlands, a non-examining SAMC. (R. at 345-99, 400-49, 451-58, 499-536.) Because there was no competing medical opinion from an examining physician, the ALJ was required to apply the six factors before refusing to accept parts of Dr. Arredondo's opinion. *See Walker v. Barnhart*, 158 F. App'x 534, 535 (5th Cir. 2005) (quoting *Newton*, 209 F.3d at 458).

17

The ALJ's decision specifically explained that as a treating source, Dr. Arredondo's medical opinions must be evaluated under the six factors listed in 20 C.F.R. § 404.1527(c). (R. at 18-20.) It does not appear to clearly consider or apply these factors, however. The decision appears to address only one "key factor" that is described as Dr. Arredondo's "amount of understanding of the disability program and its evidentiary requirements." (R. at 27.) It noted that "it [was] not entirely clear . . . which of many diagnoses underlie the opinion" and ultimately gave Dr. Arredondo's opinion "considerable, but split, weight." (R. at 26, 27.) The decision does not address the consistency of this treating source opinion with the other medical records, Plaintiff's three-year treatment history, or Dr. Arredondo's medical specialty. *See Abadie v. Barnhart*, 200 F. App'x 297, 298 (5th Cir. 2006) (holding that the "ALJ was not required to accept [the treating source's] opinions, but was required to consider them, and if he chose to reject them, to explain what conflicting evidence informed his choice"). The ALJ's decision mentions that Plaintiff needed an "examination by a pain specialist or by a pain center" in order to determine the "extent of any limitations due to pain," and that the Plaintiff "may be suffering from a pain disorder, but that no doctor [had] addressed this possibility," which is "of critical concern, because a pain disorder has the potential to explain the pain [Dr. Rowlands] regarded as disproportionate." (R. at 17, 21, 26.) The decision failed, however, to note that that Dr. Arredondo is indeed a pain specialist, and that his medical records indicated multiple times that Plaintiff suffered from "chronic pain disorder."[5] (R. at 13-32, 612, 621, 625.) Because his decision did not address consideration of the necessary factors under 20 C.F.R. § 404.1527(c), the ALJ erred when evaluating Dr. Arredondo's treating source

---

[5]  The Commissioner agrees that this section of the ALJ's decision was "admittedly confusing" because the ALJ "did have access to the records of a pain specialist," namely Dr. Arredondo, but argues that "at most this was harmless error." (doc. 15 at 8.)

opinion. *See Kneeland v. Berryhill*, 850 F.3d 749, 760 (5th Cir. 2017) (explaining that "absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician *only* if the ALJ performs a detailed analysis of the treating physicians views under the criteria set forth in [20 C.F.R. § 404.1527(c)(2)]") (emphasis in original).

## B.    Harmless Error

The Fifth Circuit has held that "[p]rocedural perfection in administrative proceedings is not required" and a court "will not vacate a judgment unless the substantial rights of a party are affected." *Mays v. Bowen*, 837 F.2d 1362, 1363-64 (5th Cir. 1988). "[E]rrors are considered prejudicial when they cast doubt onto the existence of substantial evidence in support of the ALJ's decision." *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988). In the Fifth Circuit, harmless error exists when it is inconceivable that a different administrative conclusion would have been reached absent the error. *Bornette v. Barnhart*, 466 F. Supp. 2d 811 (E.D. Tex. Nov. 28, 2006) (citing *Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003)). Accordingly, to establish prejudice that warrants remand, Plaintiff must show that the proper consideration of Dr. Arredondo's RFC assessment might have led to a different decision. *See id.* at 816 (citing *Newton*, 209 F.3d at 458).

Plaintiff argues that the ALJ's error prejudiced him because Dr. Arredondo identified limitations that are inconsistent with the hypothetical posed to the VE and with the past relevant work to which the ALJ determined he could return at step four of the sequential analysis. (doc. 14 at 22-24.) During the second hearing, the ALJ asked the VE to consider a hypothetical person with the following limitations: able to lift and carry 20 pounds occasionally and 10 pounds frequently; sit, walk, and stand for six hours in an eight-hour workday; not able to climb ramps, stairs, ladders,

ropes, or scaffolds; occasionally able to balance, stoop, kneel, crouch, and crawl. (R. at 93.) The VE testified that this hypothetical individual could perform jobs in the "light" job base, including Plaintiff's past relevant work as a security guard. (R. at 93.)

Had the ALJ's decision reflected the required assessment of Plaintiff's treating source opinion, it is not clear whether he would have adopted Dr. Arredondo's assessment and further limited Plaintiff's RFC, particularly since the decision pointed out multiple times that Plaintiff needed an "examination by a pain specialist or by a pain center," which Dr. Arredondo was. (R. at 17, 21.) Even if the ALJ afforded the treating source opinion no weight at all, it is not the duty of the reviewing court to "substitute its judgment of the facts for the ALJ's, speculate on what the ALJ could have done or would do on remand, or accept a *post hoc* rationalization." *See Benton v. Astrue*, No. 3:12-CV-0874-D, 2012 WL 5451819 at *8 (N.D. Tex. Nov. 8, 2012).  It is not inconceivable that the ALJ might have increased the limitations to Plaintiff's ability to walk/stand in the RFC if he had considered Dr. Arredondo's treating source assessment  *See McAnear v. Colvin*, No. 3:13–CV–4985-BF, 2015 WL 1378728 at *5 (N.D. Tex. Mar. 26, 2015) (finding remand was required because there was a realistic possibility of a different conclusion by the ALJ where the court was unsure of whether the ALJ considered the medical source's opinion and whether such a review would have changed the outcome of the decision). This change to the RFC would also affect Plaintiff's disability determination because the only job cited by the ALJ during step four of the sequential analysis was in the "light, semi-skilled" job base that requires the ability to walk/stand for 6 hours during an 8-hour workday,[8] which is inconsistent with Dr. Arredondo's opinion that

---

[8]  The ALJ found that Plaintiff could perform the job of security guard.  (R. at 32-33.)  This position was identified by the VE during the hearing as requiring the ability to walk or stand for 6 hours during an 8-hour workday.  (R. at 93-95); *see* U.S. Dep't of Labor, Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles at 45 (1993).

Plaintiff could walk/stand for only 2 hours during the work day. (R. at 32-33.) This would mean that there is nothing in the record to satisfy the Commissioner's burden to show the existence of other gainful employment available in the national economy that Plaintiff is capable of performing. *See Greenspan*, 38 F.3d at 236.

In conclusion, the ALJ's error was not harmless because it is not inconceivable that he would have reached a different decision had he formally considered Dr. Arredondo's treating source opinion under 20 C.F.R. § 404.1527(c).[9] *See Singleton v. Astrue*, No. 3:11–CV–2332-BN, 2013 WL 460066 at *6 (N.D. Tex. Feb. 7, 2013) (finding the ALJ's failure to consider a medical source opinion was not harmless error because the court could not say what the ALJ would have done had he considered the opinion, and had he considered the opinion he might have reached a different decision).

## IV. RECOMMENDATION

The Commissioner's decision should be **REVERSED**, and the case should be **REMANDED** for further administrative proceedings.

**SO RECOMMENDED** on this 14th day of February, 2018.

_____
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

---

[9] Though not identified as a separate issue, Plaintiff alternatively argues that substantial evidence does not support the ALJ's finding that he could stand/walk for 6 hours in an 8-hour workday because the ALJ "ignored the law" when evaluating his credibility. (doc. 14 at 10-12, 21-22.) Because the ALJ's error in evaluating Dr. Arredondo's opinion necessitates remand, this additional argument need not be considered.

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

22